# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

John Sabatini,

     Plaintiff

v.

Las Vegas Metropolitan Police Department,

     Defendant

Case No.: 2:17-cv-01012-JAD-NJK

---

Charles Moser,

     Plaintiff

v.

Devin Ballard, Patrick Neville, Las Vegas Metropolitan Police Department

     Defendants

**Order Denying the Plaintiffs' Motions for Partial Summary Judgment, Granting the Defendants' Partial Motion for Summary Judgment as to all Federal Claims, and Granting Defendants Leave to File a Limited Motion for Summary Judgment as to the State-Law Claims**

[ECF Nos. 38–41]

These two consolidated civil-rights suits primarily allege First Amendment free-speech claims under 42 U.S.C. § 1983 against the Las Vegas Metropolitan Police Department and two of its supervising officers (collectively Metro or the department). Plaintiffs John Sabatini and Charles Moser are Metro officers who were disciplined for posting material on Facebook that violated the department's social-media policy. Sabatini, a now-retired corrections officer, made over two dozen posts on his public Facebook profile that demonstrated disdain for inmates and racial bias against African Americans. Moser, who served as a SWAT team sniper at the time, commented on a Facebook post that discussed other Metro officers capturing a suspect in an officer-involved shooting, stating that it was "a shame" the suspect "didn't have a few holes in

him."[1]  Both plaintiffs claim that their resulting discipline constitutes First Amendment retaliation and that Metro's social-media policy is facially unconstitutional because it is an overbroad prospective restriction on speech and is impermissibly vague.  All parties move for partial summary judgment, raising largely overlapping issues.

Applying the well-known framework for analyzing public-employee speech stemming from *Pickering v. Board of Education*,[2] I find that at least some of Sabatini's posts touch on matters of public concern.  Because Metro did not challenge this threshold inquiry as to Moser, I proceed to balance each plaintiff's interest in their individual speech against Metro's interest in maintaining the public's trust in its police force.  And because both Sabatini and Moser's Facebook posts would erode that trust—by displaying bias against certain portions of the community and by exhibiting a cavalier and callous attitude about the use of deadly force, respectively—I find that the *Pickering* balance weighs in favor of Metro.  I therefore grant it summary judgment on the plaintiffs' retaliation claims stemming from the social-media policy and, under similar reasoning, grant Metro summary judgment on the plaintiffs' prospective-restriction claims.  I also grant Metro summary judgment on Sabatini's post-suit retaliation claim because, even if Metro had reassigned him to another unit within the jail, he has failed to show that the transfer would constitute an adverse employment action.  Finally, I grant Metro summary judgment on the plaintiffs' vagueness challenges because their own posts were clear violations of the department's social-media policy.  This case therefore proceeds only against the department on Sabatini's Nevada Constitution claims, but I grant Metro leave to address these remaining claims in a supplemental brief.

---

[1] ECF No. 38-2 at 26 (ellipses omitted).

[2] *Pickering v. Board of Education*, 391 U.S. 563 (1968).

# Background

## I.     Metro's social-media policy

The policy at issue governs the department's official use of social media, as well as its employees' private use of social media outside of working hours.[3]  The policy begins by recognizing that:

> Public employees are public servants and are entrusted with the public trust.  Because of this public trust, law enforcement personnel are held to a higher standard of professionalism than private citizens.  Law enforcement personnel must work hard to gain the trust and confidence of the community they serve. Department members must give thoughtful consideration to their actions to avoid damaging the reputation and trust the department has with the community.[4]

The policy then provides the following pertinent parameters:

> 2.     Public employees have qualified First Amendment rights. As public employees, speech, on- or off-duty, made pursuant to official duties is not protected speech under the First Amendment and may form the basis for discipline if deemed detrimental to the efficiency of operations of the department;
>
> 3.     Department members are free to express themselves as private citizens in matters of public concern to the degree that their speech does not:
>> a.     Impair working relationships of the department for which loyalty and confidentiality are important;
>> b.     *Impede the performance of duties;*
>> c.     Impair discipline and harmony among co-workers; or
>> d.     *Negatively impact or tend to negatively impact the department's ability to serve the public.*

---

[3] *See* ECF No. 42-2 at 2 ("Adherence to the department's Code of Ethics, LVMPD 1/000.02, is required in the personal use of social media"); *id.* ("ON-THE-JOB USE OF ELECTRONIC COMMUNICATION"); *id*. at 5 (prohibiting employees from "access[ing] social networking site(s) while on duty").

[4] *Id.* at 2.

4. Department members will not post, transmit, or otherwise disseminate any information, documents, photos or videos, *to which members have access as a result of employment*, without written permission from the Sheriff, or designee;[5]

The policy concludes by listing several "[p]rohibitions:"

3. Department members are prohibited from speech that *ridicules, maligns, disparages, or otherwise promotes discrimination against* race, ethnicity, religion, sex, national origin, sexual orientation, age, disability, political affiliation, gender identity and expression[,] or other explicit class of individuals;

4. Department members are prohibited from speech or other expression that suggests the person is engaged in behavior reasonably considered to be unlawful or reckless toward public safety;

5. Engaging in prohibited speech as stated in this policy, *may negatively affect the department member's credibility and impair the member's ability to perform the essential job functions*. A department member's speech is a reflection of character and values. Speech that fundamentally conflicts with the department's ICARE values negatively affects both the member's ability and the department's ability to serve the community. Violations of this policy or related policies (values, conduct, etc.) in the use of social media *that bring the member or the department into discredit or would tend to bring the member or the department into discredit* will result in the department taking appropriate action up to and including termination.[6]

"ICARE" is an acronym for "Integrity, Courage, Accountability, Respect for People, and Excellence"—values that Metro identifies as its "ethical guiding principles."[7]

---

[5] *Id.* at 2–3 (emphasis added).

[6] *Id.* at 3 (emphasis added).

[7] ECF No. 40-3 at 2.

4

## II.     John Sabatini

### A.     Facebook posts and Metro's investigation

Sabatini served for over 15 years as a corrections officer at the Clark County Detention Center (CCDC), which Metro operates.  In August 2015, an individual called Metro with an anonymous complaint about posts that Sabatini made on his personal Facebook profile and that the complainant found offensive and insensitive to inmates.[8]  The complainant later submitted five screenshots of Sabatini's posts to Metro's Internal Affairs Bureau (IAB), including one of a cartoon captioned "Suicide Watch" that Sabatini shared on his profile.[9]  It featured a stick figure reclining in a chair eating (presumably) from a box of popcorn as he looks at another stick figure standing on a chair with a noose around his neck.[10]  Along with the cartoon, Sabatini posted the caption "2C" and, in the post's comment section, wrote: "As long as he does not die on my watch.  Wait till night shift comes on."  CCDC's suicidal inmates are commonly housed in module 2C, which Sabatini was assigned to guard.[11]  The complainant explained that he knew that Sabatini is a Metro employee because Sabatini often tags the complainant's cousin, who is a Metro employee, in his posts and several of Sabatini's posts allude to working in a jail.[12]  "After one too many offensive posts," the complainant "googled [Sabatini's name] and was able to confirm" he was a Metro corrections officer.[13]  Based on the complaint, IAB began to investigate Sabatini.

---

[8] ECF No. 42-3 at 45 (complaint); *id.* at 20 (investigation report).

[9] *Id.* at 46–50; ECF No. 43-1 at 4 (full-size screenshot of the post).

[10] ECF No. 42-3 at 46–50; *id*. at 29.

[11] *Id.* at 29; ECF No. 10-39 (declaration of Deputy Chief Suey).

[12] ECF No. 42-3 at 21.

[13] *Id*. (quoting complainant's email to IAB at ECF No. 42-3 at 46).

Because Sabatini had not restricted access to his Facebook profile through the site's security settings, anyone was able to view the profile's content, including the IAB investigator.[14] Upon examining Sabatini's posts, the investigator concluded that "Sabatini never explicitly identified himself as" a Metro employee.[15] But based on the posts' use of terms commonly used in correctional facilities and references to a corrections officer's job responsibilities, the investigator found that a person could "infer" where Sabatini worked.[16] For instance, Sabatini posted a meme[17] of Jack Nicholson from the movie *A Few Good Men* with superimposed text that reads: "MORE COTS IN THE DAYROOM? BRING IT ON!"[18] Parodying one of Nicholson's famous scenes, Sabatini added a comment to his post: "I run my unit how I run my unit. You want to investigate me, roll the dice and take your chances. I eat my burrito 10 feet from 74 dirt bags who swim at the deep end of the cesspool, so don't think for one second that you can come down here, tell me my last walkthrough was 65 minutes ago, and make me nervous."[19] The IAB investigator also corroborated the fact that, by merely googling Sabatini's name and "Las Vegas," anyone could confirm that he was a corrections officer through the first search result: a website listing Nevada public-employee salaries and job titles.[20] And when later

---

[14] *Id.* at 21.

[15] *Id.* at 22.

[16] *Id.*

[17] A meme is "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media." *Meme*, Merriam–Webster Online Dictionary, http://www.merriam-webster.com/dictionary/meme.

[18] ECF No. 42-3 at 22 (citing Exhibit 4 at ECF No. 42-3 at 24).

[19] *Id.*; ECF No. 42-5 at 2 (full-size screenshot).

[20] ECF No. 42-3 at 21.

asked by the investigator if someone viewing Sabatini's Facebook profile could determine that he is a corrections officer, Sabatini admitted, "Yes perhaps so, yes."[21]

The investigator found several posts that he determined violated Metro's social-media policy. In one instance, Sabatini shared a post from a local-news outlet's Facebook page regarding an NHL player being arrested in Las Vegas.[22] He commented: "And he gets booked in and released in about 5 hours. What a crock of shit. 5K bail paid. FELONY charge. I had a guy [on a domestic-violence charge] 1st offence, a misdemeanor, but no bail money, booked in Thursday, stayed the whole weekend till court on Monday. WTF is wrong here?"[23] Sabatini later admitted to the investigator that he only knew the details about the player's case because of information he accessed through his position at CCDC.[24]

In many of the other posts flagged by the investigator, such as the Jack Nicholson meme, Sabatini commented on CCDC or its inmates. In at least ten posts, including that meme, Sabatini referred to CCDC as "the cesspool."[25] For instance, in one of the screenshots provided by the complainant, Sabatini shared a picture of soldiers sleeping on a bare floor with the superimposed text: "C.O., CAN I GET A BETTER MATTRESS?"[26] Sabatini added the comment: "Please use this example when faced with a request from a turd at the cesspool for a better mattress. After describing this picture to them, close the conversation by adding the sentence: Oh, one more thing, feel free to go back to your bunk and F yourself!" In another post, Sabatini shared an

---

[21] ECF No. 42-3 at 37; ECF No. 42-4 at 47–48.

[22] ECF No. 42-3 at 26.

[23] *Id.*; ECF No. 42-5 at 6 (full-size screenshot).

[24] ECF No. 42-3 at 26.

[25] *Id.* at 24–34, embedded exhibits 3, 4, 5, 6, 11, 16, 17, 19, 23, 24.

[26] *Id.* at 21; ECF No. 43-1 at 29 (full-size screenshot).

article about a test program at CCDC that resulted in over 100 inmates being released and

commented: "As we now wait for the turds to float back!"[27]  He later acknowledged to the IAB

investigator that "referring to inmates as turds" was "inappropriate . . . ."[28]  And in a separate

post, Sabatini shared a meme of actor R. Lee Ermey from *Full Metal Jacket* with a superimposed

quote from the film: "There is no racial bigotry here.  Here, you are all equally worthless."[29]

Sabatini added the comment: "Same philosophy at the cesspool," which he later acknowledged

would "raise some red flags" with the public if they knew he was a corrections officer.[30]  The

investigator concluded that these posts about CCDC and its inmates "could damage the

reputation and trust the department has created with the community and would certainly discredit

CO Sabatini as a corrections officer who is responsible for the wellbeing of inmates within

CCDC."[31]

The IAB investigator also flagged several posts not involving Sabatini's work that

nonetheless violated the social-media policy.[32]  For example, Sabatini shared a post from another

Facebook profile that included an image parodying the famous "HOPE" poster from President

Barack Obama's 2008 campaign by replacing the title with the word "ROPE" and changing its

---

[27] ECF No. 42-3 at 30; ECF No. 42-5 at 22 (full-size screenshot).

[28] ECF No. 42-4 at 32.

[29] ECF No. 42-3 at 25; ECF No. 42-5 at 8 (full-size screenshot).

[30] ECF No. 42-3 at 25.  Similarly, Sabatini shared a post from a Facebook page, which included a picture of two police officers, one white and one black, who both had their palms extended with the message written on them "His life matters" and an arrow pointing at the other officer.  ECF No. 42-3 at 33.  Sabatini commented: "All lives matter.  With the exception of sex offenders, gang bangers, and a few others."  *Id.*; ECF No. 43-1 at 14 (full-size screenshot).

[31] ECF No. 42-3 at 41.

[32] *Id.*

portrait of Obama to an image of him hanging from a noose around his neck.[33]  Sabatini

commented: "I guess the emperor thought it was going to be a lovefest sprinkled with unicorns

and glitter when he opened his POTUS twitter account.  Think again.  I don't see that lasting

very long."  He later acknowledged that the post could be "construed" as "a racist image."[34]

Sabatini also posted an article about an African American U.S. Representative from

Pennsylvania who was indicted on multiple charges, commenting: "But he is a democrat, and hes

[sic] a black man.  Based on the pattern of the liberal media machine, you won't be hearing much

more about this story.  A member of the appropriations committee indicted on racketeering.

What a joke our bureaucrats are!"[35]

Sabatini also posted several times about the Black Lives Matter movement, referring to

its supporters as "ghetto trash race baiting scumbags" who "blame their laziness and misfortunes

on others" and "[r]ace baiting pieces of shit" who should "[b]urn in hell . . . ."[36]  He later

acknowledged that his comments could "perhaps" "promote racial bias."[37]  Sabatini similarly

shared two articles about Michael Brown, the young African American man fatally shot by a

police officer in Ferguson, Missouri.  One article is titled "Michael Brown Memorial – A

Memorial to Why Blacks are Ghetto Dwellers," about which Sabatini commented: "And there

was a video of this piece of shit punching out an old man.  Real hero.  Ghetto thug turd."[38]  The

---

[33] ECF No. 42-3 at 28; ECF No. 43-1 at 2 (full-size screenshot).

[34] ECF No. 42-3 at 28–29.

[35] *Id.* at 32; ECF No. 43-1 at 10 (full-size screenshot).  Sabatini also shared an article addressing the rising murder rates in Baltimore, Maryland, on which he commented: "Not gonna happen. Black democrat in charge.  Focus on the Ravens upcoming seasons."  ECF No. 42-3 at 33; ECF No. 43-1 at 12 (full-size screenshot).

[36] ECF No. 42-3 at 35; ECF No. 43-1 at 16, 18 (full-size screenshots).

[37] ECF No. 42-3 at 35–36.

[38] *Id.* at 29; ECF No. 43-1 at 6 (full-size screenshot).

other article discussed a Michael Brown exhibit opening in Chicago, with Sabatini commenting: "Is there a snack bar and gift shop too?" and "Sure. Bumper stickers, t shirts, coffee mugs. Snacks like chicharrones, steel reserve, grape soda."[39] He later stated to the IAB investigator that these are "unfortunately . . . popular items among the Black inner city dwellers."[40] Sabatini also shared a post from another Facebook page featuring a picture of several black men and women seemingly looting a store, with the superimposed text: "LOOTING, WHEN FREE FOOD, HOUSING, PHONES[,] AND EDUCATION AREN'T ENOUGH."[41] Sabatini added: "Thanks for promoting the stereotype girlfriend," which he later claimed was a reference to one of the women in the photo who was wearing a "Black Power" t-shirt.[42]

The final and most recent post the investigator identified was one Sabatini shared from another Facebook page that included a close-up photo of an African American woman smiling into the camera.[43] Although the photo is black and white in the record, the IAB report describes the woman as wearing "a turquoise colored top and matching turquoise lipstick."[44] Sabatini did not comment on the post, but its original caption reads: "The modern black wmn [sic] has literally become a clown. [T]hey walk out of the house like this and u cant [sic] tell this woman that shes [sic] not looking great[.] [I']m sorry but there is a mental problem going on with our women and it needs to addressed openly and honestly."[45] When asked if this post "promote[s] a

---

[39] ECF No. 42-3 at 31; ECF No. 43-1 at 8 (full-size screenshot).

[40] ECF No. 42-3 at 31; ECF No. 42-4 at 24; ECF No. 42-1 at 15.

[41] ECF No. 42-3 at 27; ECF No. 42-5 at 24 (full-size screenshot).

[42] ECF No. 42-3 at 27.

[43] *Id.* at 37; ECF No. 43-1 at 20 (full-size screenshot).

[44] ECF No. 42-3 at 37.

[45] *Id.* (ellipsis omitted).

racial bias or stereotype," Sabatini responded, "Yes, perhaps it does, yes."[46]  Sabatini shared this post and the ones commenting on Black Lives Matter *after* IAB informed him that he was being investigated.[47]  The IAB investigator found that these non-work-related posts "promoted racial discrimination," were "disparaging towards the African American community," "promoted racial biases and stereotypes," and "clearly promoted racial ridicule."[48]

Sabatini also reported during the investigation that other Facebook users had reported his account to the website several times for posting on "hot button issues" and that site had suspended his account on multiple occasions for several days at a time.[49]  Asked whether, based on these Facebook suspensions, he was surprised "that somebody may be offended by [his] Facebook posts," Sabatini responded, "Absolutely no surprise at all."[50]  He also acknowledged that he was "commenting on hot button topics that create some divide[.]"[51]

## B. Metro's post-investigation proceedings

After reviewing Sabatini's Facebook posts and considering the fact that they prompted a community member to contact Metro, the investigator concluded that the posts brought "discredit" to Sabatini and "would tend to bring the department into discredit as well."[52]  The investigator thus found that Sabatini violated the department's social-media policy.[53]  He also

---

[46] *Id.*; ECF No. 42-4 at 47.

[47] *Compare* ECF No. 42-3 at 19 (admonished on August 27, 2015), *with id.* at 35–37 (posts from August 30, 2015, onwards).

[48] ECF No. 42-3 at 41.

[49] ECF No. 42-3 at 23; ECF No. 42-4 at 43.

[50] ECF No. 42-4 at 44.

[51] *Id.*

[52] ECF No. 42-3 at 41–42.

[53] *Id.* at 42 ("sustaining" the allegation that Sabatini violated the policy).

found that Sabatini acted insubordinately by telling another corrections officer about the complaint against him after IAB instructed him not to discuss the matter with anyone other than authorized personnel.[54]

IAB submitted its report to Sabatini's superior officers, and his bureau commander issued an "adjudication of complaint."[55] After briefly summarizing the investigation's findings and evidence, the commander concluded that Sabatini's "public posts containing racial animus, degradation of the CCDC and inmates, and disclosure of information accessed and obtained as a result of [his] employment, have brought discredit to the Department and are a violation of" its social-media policy.[56] He also agreed that Sabatini displayed insubordination and that, based on these violations, his conduct fell under "Line 29" of Metro's Disciplinary Decision Guide, which provides a matrix of conduct and permissible discipline based on the number of offenses.[57] Under Line 29, an employee may be terminated for a first-time "major" offense of "[a]ny act or omission of such an egregious nature that the employee is rendered ineffective in his position and/or the act or omission would tend to bring the Department into public discredit."[58] The bureau commander ultimately concluded:

> I am recommending termination due to the serious, repeated, and egregious pattern of racial animus and bias particularly towards inmates, as well as African Americans. As well, your referencing CCDC as a cesspool and its inmates' lives as worthless exposes the Department to great scrutiny and liability in carrying out its

---

[54] ECF No. 42-3 at 19, 42.

[55] ECF No. 43-1 at 33–35. Sabatini's division commander also signed off on the adjudication. *Id.*; *see also* ECF No. 43-3 at 6 (making clear that the bureau commander authored the adjudication).

[56] ECF No. 43-1 at 34.

[57] *Id.*; ECF No. 42-2 at 44.

[58] ECF No. 42-2 at 46.

mission. Your ability to effectively perform as a Corrections
Officer, and provide services to inmates (particularly minorities)
who you clearly despise is irreparably tarnished. Also, I have
found that there are aggravating factors which elevate your
misconduct to termination. Namely, your insubordination, and
blatant, open, and public Facebook posts after you were
admonished. As well, you continued to operate your Facebook in
a public and irresponsible manner, even after being advised that a
complaint had been lodged. You also admitted to accessing and
disseminating information gained through your employment, and
then posting that information to Facebook. Based on the
foregoing, I am recommending that your employment be
terminated.[59]

After this adjudication, Metro convened a pre-termination board consisting of two Metro

officers and a civilian director.[60] Sabatini was represented by counsel. The board agreed with

the bureau commander's conclusions and specifically found that "Sabatini's behavior displayed a

serious, repeated, and egregious pattern of racial animus and bias particularly towards inmates,

as well as African Americans[,] which has rendered him ineffective in his position as a

Corrections Officer."[61] The board therefore unanimously recommended that Sheriff Joseph

Lombardo terminate Sabatini.[62] The Sheriff reviewed the matter and agreed that Sabatini's posts

displayed racial animus, degraded CCDC and its inmates, and "brought discredit" to Metro.[63]

He therefore terminated Sabatini.

Under the terms of the collective-bargaining agreement that applies to Metro officers,

Sabatini was able to appeal the termination to an independent arbitrator, who held a hearing. The

arbitrator issued a written decision finding that Sabatini's Facebook posts violated Metro's

---

[59] ECF No. 43-1 at 34–35.

[60] ECF No. 43-2 at 2 (hearing transcript).

[61] ECF No. 43-3 at 4 (hearing memo).

[62] *Id*.

[63] *Id*. at 7 (Sheriff's memo).

social-media policy because they "negatively impact[ed] the Department's ability to serve the public" by "cast[ing] the CCDC in a bad light" and "bring[ing] discredit on" its mission.[64] However, the arbitrator also found that termination was an "unreasonable" punishment and ultimately reduced the discipline to 40 hours of unpaid suspension.[65] This was ultimately the only discipline that Sabatini received.

### C. Sabatini's suit and motion for a temporary restraining order

Sabatini sued Metro in April 2017, alleging First Amendment and Due Process claims under § 1983, as well as parallel claims under the Nevada Constitution.[66] Under his third claim, Sabatini alleges that his "supervisors contemplated changing [his] work assignment" in "retaliation" for him filing suit against Metro—which he asserts violates the First Amendment.[67] Sabatini moved for a temporary restraining order to prevent a transfer and attached his own declaration stating: "[M]y immediate supervisor, Sergeant Thomas Floyd, informed me that my bureau commander, Captain Fred Meyer, planned to pull me from my current post assignment due to accusations of collusion with a coworker and this lawsuit."[68] I held a hearing and denied the motion on the record, finding that Sabitini's "thin" and "vague[]" declaration failed to establish a likelihood of irreparable harm.[69] This case proceeded forward, and in March 2018, Sabatini retired from Metro.[70]

---

[64] ECF No. 43-3 at 28–29.

[65] *Id*. at 35, 60.

[66] ECF No. 6 (first-amended complaint).

[67] *Id*. at 8–9.

[68] ECF No. 7-1 at 2 (Sabatini's declaration); ECF No. 7 (TRO motion).

[69] ECF No. 37 at 18–22.

[70] ECF No. 42-1 at 4.

## II.    Charles Moser

Moser is a former Navy SEAL sniper who joined Metro in 2000.[71]  Six years later, he joined Metro's SWAT team as a sniper.[72]  In December 2015, an assailant shot a Metro officer in the line of duty.[73]  Moser was not present.  Several days later, the suspect was apprehended by a unit that included one of Moser's friends, a former SWAT team member.  Moser eventually saw a post on Facebook about the suspect being caught[74] and commented on that post: "Thanks to a Former Action Guy (FAG) and his team we caught that asshole . . .  It's a shame he didn't have a few holes in him . . ."[75]  Next to Moser's name above the post is his profile picture, which at the time was a cartoon of an angry-looking soldier with a helmet and rifle and the word "sniper" written across his chest.[76]  Moser later explained that the term "Former Action Guy" was a nickname that his friend had given himself after he voluntarily transferred from the SWAT team to his current unit.[77]

An anonymous complaint was filed, which prompted an IAB investigation.[78]  The IAB investigator found that, based on the fact that Moser had been the subject of recent news stories involving his role as a sniper in officer-involved shootings and the personal information listed on his Facebook profile, other Facebook users could identify Moser as a Metro officer and SWAT

---

[71] *Id*. at 32 (Moser's deposition).

[72] *Id*. at 31.

[73] *Id*. at 32.

[74] It is not clear whether Moser was commenting on an article posted by a news outlet on Facebook or a post by an individual's Facebook profile that included a link to the article.  *See* ECF No. 42-1 at 32.

[75] ECF No. 43-5 at 4 (ellipses in original) (screenshot of post).

[76] *Id.*; ECF No. 43-5 at 11.

[77] ECF No. 42-1 at 33.

[78] *See* ECF No. 38 at 3; ECF No. 43-5 at 11 (IAB investigation report).

sniper.[79]  During his interview with the IAB investigator, Moser stated that he had been upset about the shooting and realized after the fact that his post was "completely inappropriate" and that he "shouldn't have ever said that."[80]  The investigator found that, "[t]hough Officer Moser was expressing himself as a private citizen, [his Facebook post] would negatively impact or tend to negatively impact the department's ability to serve the public and would impede the performance of Officer Moser's duties as a sniper in SWAT."[81]  He therefore concluded that Moser's post violated Metro's social-media policy.

IAB submitted its report to Moser's superior officers, who issued an adjudication of complaint.[82]  Moser's superiors agreed that his "comment on a social media site regarding the use of deadly force was inappropriate and would tend to negatively affect the public's perception of the Department."  They therefore issued a "disciplinary transfer" and moved Moser to a patrol unit, allowing him to apply for a transfer back to SWAT only after a year.[83]  This form of discipline was decided upon by the two individual defendants: Captain Devin Ballard, Moser's former bureau-area commander, and Deputy Chief Patrick Neville, his former division commander.[84]  After Moser submitted a grievance, the Labor Management Board was convened and ultimately upheld the transfer.[85]  It reasoned that, based on "the nature of the position in SWAT," its officers are "held to an incredibly high standard."

---

[79] ECF No. 43-5 at 11.

[80] *Id.* at 12; ECF No. 43-5 at 23 (IAB interview); ECF No. 42-1 at 34 (Moser's deposition).

[81] ECF No. 43-5 at 13.

[82] *Id.* at 16.

[83] *Id.*

[84] *Id.*; ECF No. 38 at 3–4.

[85] ECF No. 44-1 at 25.

Moser sued Metro, Ballard, and Neville in mid-2017, alleging two separate First Amendment claims challenging both his discipline under the social-media policy and the policy's facial constitutionality.[86]  Moser's case was originally assigned to a different judge in this district, but he moved to consolidate it with Sabatini's suit, and Metro did not oppose.[87]  I therefore consolidated the two cases for purposes of discovery and dispositive motions.[88]

**Legal standard**

Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[89]  When considering summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[90]  If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed, and the case must then proceed to the trier of fact.[91]

If the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial."[92]  "To defeat summary judgment, the

---

[86] 2:17-cv-1704-JAD-NJK at ECF No. 9.

[87] *Id.*; 17-cv-1012 at ECF No. 24.

[88] ECF No. 26.

[89] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

[90] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[91] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

[92] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

1  nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy

2  its burden at trial."[93]

3  **Discussion**

4  Metro and both plaintiffs move for partial summary judgment. Sabatini seeks summary

5  judgment only on his facial challenge to the social-media policy, claiming that it is an overbroad

6  prospective restriction under the First Amendment and is impermissibly vague under the First

7  Amendment and the Fourteenth Amendment's Due Process Clause.[94] Moser addresses only the

8  constitutionality of his transfer under the First Amendment but joins in Sabatini's facial

9  challenge.[95] Metro seeks summary judgment on all federal claims, arguing that neither the

10 social-media policy nor the plaintiffs' discipline violated the First Amendment and, in the

11 alternative, that both individual defendants are entitled to qualified immunity.[96] Metro also

12 challenges Sabatini's retaliation claim premised on the alleged post-suit contemplated transfer.

13 I first address the plaintiffs' discipline and then turn to the facial challenges. Because I

14 find that Metro and its employees did not violate the plaintiffs' constitutional rights, I need not

15 and do not address qualified immunity.

16 **I.     I grant Metro summary judgment on the First Amendment retaliation claims.**

17 More than fifty years ago, the U.S. Supreme Court recognized in *Pickering* "that citizens

18 do not surrender their First Amendment rights by accepting public employment."[97] Rather,

19 "'there is considerable value in encouraging, rather than inhibiting, speech by public employees,'

20

---

21 [93] *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018).

22 [94] ECF No. 40.

   [95] ECF No. 38.

23 [96] ECF No. 41.

   [97] *Lane v. Franks*, 573 U.S. 228, 231 (2014).

because 'government employees are often in the best position to know what ails the agencies for which they work.'"[98]  But a public employer may nonetheless "impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public."[99]  So, "the First Amendment protection of a public employee's speech depends on a careful balance 'between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'"[100]

The Ninth Circuit has developed a "sequential five-step" analysis for claims premised on a public employer disciplining its employee based on his speech.[101]  To succeed on what the court refers to as a "First Amendment retaliation" claim,[102] a plaintiff-employee must first establish that "(1) [he] spoke on a matter of public concern; (2) [he] spoke as a private citizen rather than a public employee; and (3) the relevant speech was a substantial or motivating factor in the adverse employment action."[103]  If the employee can establish this prima facie case, the burden then shifts to the public employer to show "that (4) it had an adequate justification for

---

[98] *Moonin v. Tice*, 868 F.3d 853, 860 (9th Cir. 2017) (brackets and ellipsis omitted) (quoting *Lane*, 573 U.S. at 236).

[99] *Id.*

[100] *Lane*, 573 U.S. at 231 (quoting *Pickering*, 391 U.S. at 568).

[101] *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

[102] *See, e.g.*, *Barone v. City of Springfield*, 902 F.3d 1091, 1097 (9th Cir. 2018); *Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009).  In contrast to First Amendment claims that facially challenge a policy, regulation, or statute that creates a *prospective* restriction on public-employee speech, a retaliation claim challenges a "post hoc disciplinary action" taken by the government employer against its employee based on speech that the employer concludes violates an applicable policy.  *See Barone*, 902 F.3d at 1102, 1105; *see also Liverman v. City of Petersburg*, 844 F.3d 400, 409 (4th Cir. 2016) (distinguishing between "an ex post disciplinary action" and "an ex ante restraint on speech").

[103] *Barone*, 902 F.3d at 1098 (9th Cir. 2018).

treating [its employee] differently than other members of the general public; or (5) it would have taken the adverse employment action even absent the protected speech."[104]  Here, Sabatini asserts two separate First Amendment retaliation claims: one for his initial termination from Metro for violating its social-media policy and another for the transfer that Metro allegedly contemplated after he filed suit against it.[105]  Moser's sole retaliation claim is premised on his disciplinary transfer that resulted from violating the social-media policy.[106]  I will first analyze the plaintiffs' retaliation claims based on the social-media policy because these claims ultimately turn on the balance between each plaintiff's First Amendment rights and Metro's justification for curtailing their specific speech.  I then turn to Sabatini's post-suit retaliation claim.

### A.  Discipline based on violating Metro's social-media policy

Metro does not dispute most of the steps in the *Pickering* analysis for either plaintiff.  For Sabatini's first claim, Metro argues that, under step one, his Facebook posts regarding inmates, CCDC, and African Americans did not touch on matters of public concern and are therefore not entitled to First Amendment protection.  Alternatively, Metro contends that, at step four, the *Pickering* balance tilts in its favor for Sabatini's claim because, as a police department, it has a strong interest in maintaining public trust, which it asserts is eroded by a corrections officer demonstrating disdain for the inmates under his care and prejudice against African Americans generally.  As for Moser, Metro only argues that it prevails at the step-four *Pickering* balance,

---

[104] *Id.*

[105] ECF No. 6 at 6, 9.  Sabatini's complaint is not a model of clarity.  Although he alleges First Amendment claims under counts one and three, and both counts challenge Metro's disciplinary actions against him, he only titles his third claim as First Amendment "retaliation."  *Id.*  But both claims are properly characterized as retaliation claims because they challenge an alleged adverse employment action stemming from speech that already occurred.  *See Barone*, 902 F.3d at 1097.

[106] ECF No. 9 at 2–3.

1  similarly asserting that his statement about the police-shooting suspect not having "a few holes in

2  him" erodes public trust and exposes Metro to legal lability.

3       **1.     Because at least some of Sabatini's Facebook posts commented on
              matters of public concern, I find that this threshold inquiry is
4             satisfied.**

5       Whether speech touches on a matter of public concern is a question of law.[107]  Because

6  the inquiry "is not an exact science," the Ninth Circuit has "forsworn rigid multi-part tests that

7  would shoehorn communication into ill-fitting categories and [has instead] relied on a

8  generalized analysis of the nature of the speech."[108]  "It is clear, however, that the essential

9  question is whether the speech addressed matters of 'public' as opposed to 'personal' interest."[109]

10  "Speech involves a matter of public concern when it can fairly be considered to relate to any

11  matter of political, social, or other concern to the community."[110]  "But speech that deals with

12  individual personnel disputes and grievances and that would be of no relevance to the public's

13  evaluation of the performance of governmental agencies is generally not of public concern."[111]

14  To assess this distinction, courts must "examine the content, form, and context of a given

15  statement, as revealed by the whole record . . . ."[112]

16       Critically, "[t]he inappropriate or controversial character of a statement is irrelevant to

17  the question of whether it deals with a matter of public concern.  'Debate on public issues should

18  be uninhibited, robust, and wide-open, and may well include vehement, caustic, and sometimes

19

20  [107] *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009).

    [108] *Id*. (internal quotation marks and citation omitted).

21  [109] *Id*. (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)).

22  [110] *Eng*, 552 F.3d at 1070 (internal quotation marks and citation omitted).

    [111] *Id*. (internal quotation marks and citation omitted).

23  [112] *City of San Diego v. Roe*, 543 U.S. 77, 83 (2004) (internal quotation marks and citation
    omitted).

unpleasantly sharp attacks on government and public officials.'"[113]  For instance, in *Rankin v. McPherson*, a sheriff's office terminated an employee who, upon hearing news that President Ronald Reagan had been shot, stated: "[H]e's cutting back medicaid and food stamps. . . . [I]f they go for him again, I hope they get him."[114]  Finding that this statement touched on a matter of public concern, the Supreme Court disregarded its "controversial character" and instead focused on the fact that "[t]he statement was made in the course of a conversation addressing the policies of the President's administration" and "came on the heels of a news bulletin regarding what [was] certainly a matter of heightened public attention: an attempt on the life of the President."[115] With this guidance in mind, I turn to Sabatini's statements.

Metro argues that "all (or at least a majority) of Sabatini's Facebook comments and posts involved his private interests and not matters of public concern."[116]  Pointing to his references to CCDC as a "cesspool" and its inmates as "worthless," "dirtbags," and "turds," Metro contends that Sabatini's comments "have no bearing on the function of the jail or" the department, but were instead his personal view of his working environment.[117]  But that is a somewhat oversimplification and generalization of his many posts.  For example, even during the IAB investigation, Sabatini claimed that his comment about the NHL player being released on bail

---

[113] *Rankin v. McPherson*, 483 U.S. 378, 387 (1987) (brackets and ellipsis omitted) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

[114] *Id*. at 381.

[115] *Id*. at 387; *see also Victor v. McElveen*, 150 F.3d 451, 456 (5th Cir. 1998) (citing *Rankin* and finding that a deputy's comments during a sheriff's office meeting about a proposed policy that he believed would result in only African-American deputies patrolling a predominately African-American neighborhood touched on a matter of public concern, even though he first stated that there were "enough black people [in the audience] to do a Tarzan movie").

[116] ECF No. 41 at 31.

[117] *Id*.

within hours of arrest was a comment on Metro's "preferential treatment of celebrities."[118]  And as for his post stating, "we now wait for the turds to float back up," Sabatini points out that he spoke in response to a news article about a program that allowed more than 100 CCDC inmates to be released.[119]  He asserts that he was trying to convey that this program was ill-advised and posed a public danger.  Looking, as I must, at the content and context of Sabatini's posts about CCDC and its inmates and disregarding the "controversial character" of his comments, I find that at least some of these posts express disapproval of elements of the criminal-justice system and thus touch on matters of public concern.[120]

Still, many other posts about Sabatini's work convey no discernible social or political message.  For instance, the cartoon "Suicide Watch," which portrays a person being amused by a suicide attempt and references the CCDC module for suicidal inmates, appears to be merely a crass attempt at humor.  Although comedy can often be a medium for commenting on matters of public concern, Sabatini offers no explanation for what message he was trying to convey through that post.  Nor does he address the *Full Metal Jacket* meme that, combined with his comment, referred to everyone in "the cesspool" as "worthless."

And although Sabatini now attempts to editorialize some of the other memes he shared and ascribe a public-concern message to them, courts must "look to what . . . employees actually said, not what they say they said after the fact."[121]  Sabatini asserts, for instance, that he

---

[118] ECF No. 42-3 at 26.

[119] ECF No. 50 at 15.

[120] *See Pool v. VanRheen*, 297 F.3d 899, 906 (9th Cir. 2002) (holding that, although "a close call," a senior police officer commented on a matter on a public concern when she publicly stated that the sheriff's office was a "good ole boy network" and compared it to "a septic tank" because "the really big chunks always rise to the top").

[121] *Desrochers*, 572 F.3d at 711

attempted to comment on the "working conditions in CCDC" by sharing the *A Few Good Men* meme with his accompanying comment about eating his "burrito 10 feet from 74 dirt bags who swim at the deep end of the cesspool . . . ."[122]  But even if that purported underlying message constitutes a matter of public concern, it is not discernable from the post itself, so I need not accept Sabatini's "post hoc characterization[]" of his speech.[123]

Sabatini's posts about matters other than CCDC and its inmates pose added complexity because the Ninth Circuit has recognized that "it is not entirely clear" under Supreme Court precedent whether statements *unrelated* to a plaintiff's public employment must raise a matter of public concern in order to warrant First Amendment protection.[124]  But because the Ninth Circuit has not clarified the matter and neither Metro nor Sabatini addresses the distinction between related and unrelated employee speech, I will apply the public-concern standard to all of Sabatini's Facebook posts.

Sabatini's posts about non-workplace matters, however, included a mixture of protected and unprotected speech.  Although sharing an image of President Obama being hanged conveys powerful racial undertones, his included comment is explicitly critical of the then-president, who

---

[122] ECF No. 50 at 14.

[123] *Desrochers*, 572 F.3d at 711–12 ("[W]e decline to construe the sergeants' speech differently from its plain language." (internal quotation marks, citation, and brackets omitted)).

[124] *Dible v. City of Chandler*, 515 F.3d 918, 927 (9th Cir. 2008); *id.* at 932 (Canby, J., concurring in the judgment) ("As the majority opinion points out, the Supreme Court has not . . . made perfectly clear whether a governmental employee's expression unrelated to the employment must be of public concern to be protected.  In my view it makes little sense to impose the public concern requirement for the protection of unrelated speech . . . ."); *see also Locurto v. Giuliani*, 447 F.3d 159, 174 (2d Cir. 2006) (addressing this same ambiguity).  *But see United States v. Nat'l Treasury Employees Union* (*NTEU*), 513 U.S. 454, 466 n.10 (1995) (recognizing that, in *Rankin*, the Supreme Court "directly applied the *Pickering* balance to speech whose content had nothing to do with the workplace" after concluding that the plaintiff's statement about shooting the president involved a matter of public concern).

Sabatini sarcastically refers to as "the emperor" and who Sabatini appears to conclude had an unrealistic view of his own popularity. This post thus resembles the "caustic" comment about Reagan's shooting in *Rankin*, which was made in the context of criticizing that president's social policies. Similarly, Sabatini's posts lambasting the Black Lives Matter movement generally and the "liberal media" for (in his view) providing skewed coverage of the indicted African American Democrat undoubtedly touch on matters of public concern—even if they, too, invoke racist connotations.

Other posts, however, advance no discernable political or social statement. Sabatini has not addressed his final post, in which he shared a third-party post referring to "the modern black [woman]" as "a clown," but this statement cannot reasonably be construed as commenting on a matter of public concern. And although Sabatini argues that his statements about Michael Brown are criticisms of a public figure that he believes is unworthy of praise,[125] his accompanying statement about a museum exhibit's snack bar carrying stereotypical foods and beverages is, once again, merely a crass attempt at humor.

In sum, Sabatini's many Facebook posts present a mixed bag of statements—some addressing matters of public concern and others not. Neither the Supreme Court nor the Ninth Circuit has provided guidance on how courts should proceed when only some of the public-employee's statements are protected under the First Amendment. But faced with a comparable step-one result in a case involving a firefighter violating a social-media policy, the Fourth Circuit in *Grutzmacher v. Howard County* pressed forward with its analysis, "weigh[ing] whatever public interest commentary [was] contained in [the plaintiff's] Facebook activity against the [fire] [d]epartment's dual interest as a provider of public service and employer of persons hired

[125] ECF No. 50 at 17–18.

to provide that service."[126]  Because this approach comports with the *Pickering* framework, I too will proceed to balancing Metro's interest against the plaintiffs' interest in their speech.

> ### 2. Metro's interest in maintaining public trust in its officers and the department as a whole outweighs the plaintiffs' interest in their speech.

Under the *Pickering* balancing test, "the government must establish that its 'legitimate administrative interests outweigh the employee's First Amendment rights.'"[127]  This "inquiry is ultimately a legal question," but it may involve "underlying factual disputes."[128]  On the employee side of the scale, courts examine how closely the employee's speech comes to the core of the First Amendment.  "The more tightly the First Amendment embraces the speech the more vigorous a showing" the government must make to justify curtailing that speech.[129]  Similarly, the more an employee directs his speech at the public or the media—rather than a smaller, private audience—the more the First Amendment is implicated.[130]

---

[126] *Grutzmacher v. Howard County*, 851 F.3d 332, 344 (4th Cir. 2017) (internal quotation marks, citation, and brackets omitted), *cert. denied*, 138 S. Ct. 171 (2017).

[127] *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1106–07 (9th Cir. 2011) (quoting *Eng*, 552 F.3d at 1071).

[128] *Eng*, 552 F.3d at 1071.  There are no disputes of material fact in this case.

[129] *Johnson v. Multnomah County*, 48 F.3d 420, 426 (9th Cir. 1995); *see also Connick*, 461 U.S. at 152 ("We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern."); *Dible*, 515 F.3d at 928 (9th Cir. 2008) ("[I]t is a bit difficult to give ['the right to engage in public indecent activity'] the same weight as the right to engage in political debate or to lecture on religion and black history or to write articles about the environment." (footnotes omitted)); *Grutzmacher*, 851 F.3d at 348 ("Plaintiff's Facebook activity is not of the same ilk as the speech at issue in [prior cases] which this Court found sufficient to outweigh the types of significant governmental interests at issue here."); *Shepherd v. McGee*, 986 F. Supp. 2d 1211, 1221 (D. Or. 2013).

[130] *Roe v. City & County of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997); *McGee*, 986 F. Supp. 2d at 1221.

These First Amendment rights are balanced against the government's interests, which "include promoting efficiency and integrity in the discharge of official duties and maintaining proper discipline in the public service."[131]  In assessing these broad principles, courts look to several factors, including:

> [W]hether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.[132]

On this side of the scale, courts also assess the scope of the employee's speech.[133]  Although, as mentioned above, a wider audience enhances the employee's free-speech interests, it can also increase the potential for disrupting government functions.[134]  "[T]o find that the government's interest as an employer in a smoothly-running office outweighs an employee's first amendment right, defendants must demonstrate actual, material and substantial disruption, or reasonable

---

[131] *Id.*

[132] *Grutzmacher*, 851 F.3d at 345 (citation omitted).

[133] *Liverman*, 844 F.3d at 407.

[134] *Id.*; *see also Rankin*, 483 U.S. at 389 (finding that there was no danger that the sheriff's office employee who stated that she hoped someone would try to assassinate Reagan again "had discredited the office" because she made the statement "in a private conversation with another employee" and in an area of the office where "there was ordinarily no public access").

predictions of disruption in the workplace."[135]  "[T]he government's justification cannot be mere speculation,"[136] but "its reasonable prediction of disruption is entitled to substantial weight."[137]

> a.  *A public employer's interest in maintaining public trust can, on its own, outweigh an employee's interest in his speech.*

Metro does not contend that either plaintiff's Facebook posts caused actual disruptions within the police department.  Rather, Metro's position throughout its internal proceedings for both officers was that their comments, if read by the broader public, would injure the community's trust in the department and thereby affect its ability to accomplish its public-safety mission.  And Metro advances this same assertion on summary judgment, relying primarily on the Fourth Circuit's decision in *Grutzmacher*.[138]

There, a county fire department fired the plaintiff, a first-responder supervisor,[139] for violating its social-media policy and code of conduct.[140]  In response to news coverage about the gun-control debate, the plaintiff posted on his Facebook profile: "[L]ets [sic] all kill someone with a liberal . . . then maybe we can get them outlawed too!  Think of the satisfaction of beating

---

[135] *Robinson*, 566 F.3d at 824 (internal quotation marks, citations, and brackets omitted).

[136] *Dible*, 515 F.3d at 928.

[137] *Tindle v. Caudell*, 56 F.3d 966, 972 (8th Cir. 1995) (citing *Waters v. Churchill*, 511 U.S. 661, 673 (1994)).

[138] *See, e.g.*, ECF Nos. 41 at 34, 54 at 5.

[139] *Grutzmacher*, 851 F.3d at 336 ("[A]s a battalion chief, Plaintiff was responsible for managing the day-to-day operations of the field, as well as ensuring the policies and procedures as written in the department are complied with." (quotation marks and alterations omitted)); *id*. at 337 ("Although positioned at the lower end of the chain-of-command, [the plaintiff] described the rank of battalion chief as 'the most critical leadership position in the organization,' as battalion chiefs directly supervise first responders.").

[140] *Id*. at 339–40.

a liberal to death with another liberal . . . its [sic] almost poetic . . ."[141]  Minutes later, a volunteer

paramedic commented on that post: "But . . . was it an 'assult liberal'? [sic]  Gotta pick a fat one,

those are the 'high capacity' ones.  Oh . . . pick a black one, those are more 'scary'. [sic]"[142]  The

plaintiff then "liked" the comment and replied: "Lmfao!  Too cool . . . !"[143]  After department

employees complained about the posts and a superior officer directed the plaintiff to remove

them, the plaintiff did so, but also complained on Facebook about the issue, commenting that the

county that employed him and "the Federal Government are all Liberal Democrat held at this

point in time.  Free speech only applies to the liberals, and then only if it is in line with the

liberal socialist agenda."[144]  The department fired the plaintiff, finding that he "adopted" the

volunteer paramedic's comment, "which had racial overtones and was insensitive and derogatory

in nature," and that his follow-up posts "[d]emonstrated 'repeated insolence and

insubordination' . . . ."[145]  He then sued for First Amendment retaliation.  At the step-four

*Pickering* balancing, the Fourth Circuit found that the fire department's "interest in efficiency

and preventing disruption outweighed" the plaintiff's interest in his speech for several reasons.[146]

In analogizing to the instant case, Metro focuses on the court's conclusion that the

plaintiff's speech in *Grutzmacher* "frustrated the Department's public safety mission and

threatened 'community trust' in the Department, which is 'vitally important' to its function."[147]

---

[141] *Id*. at 338 (ellipses in original).

[142] *Id*. (ellipses in original).

[143] *Id*.

[144] *Id*. at 338–39.

[145] *Id*. at 339–40.

[146] *Id*. at 345.

[147] *Id*. at 346; *see also, e.g.*, ECF No. 54 at 5 ("The reasoning utilized in *Grutzmacher* applies with equal force here.").

Firefighters, the court reasoned, "are quintessentially public servants" and "[a]s such, part of their job is to safeguard the public's opinion of them, particularly with regard to a community's view of the respect that firefighters accord the members of that community."[148] The Fourth Circuit found that the plaintiff harmed that community trust by "advocat[ing] violence to effect a political agenda," and making statements that "could be interpreted as supporting racism or bias"—"thereby interfer[ing] with the public trust of [the plaintiff] being able to make fair decisions for everybody."[149]

Both plaintiffs here counter that *Grutzmacher* is distinguishable because there was evidence in the record there that the firefighter-plaintiff's comments caused actual disruptions in his department and hurt working relationships. At least one other supervisor, for instance, had to have numerous conversations with first responders about the social-media policy.[150] And three African American employees expressed concern about the plaintiff's posts, including one fireman who stated: "I don't want to work for [the plaintiff] anymore. I don't trust him."[151] In contrast, Sabatini and Moser highlight that there is no evidence that their own Facebook posts harmed their working relationships or in any way disrupted their respective unit's functions.[152] They further contend that Metro hasn't provided evidence demonstrating how, absent such actual

---

[148] *Grutzmacher*, 851 F.3d at 346 (ellipsis omitted) (quoting *Locurto v. Giuliani*, 447 F.3d 159, 178–79 (2d Cir. 2006)).

[149] *Id*. at 347.

[150] *Id*. at 345.

[151] *Id*. (brackets in original).

[152] Sabatini, for instance, cites to Metro's interviews with other corrections officers who stated that they were not offended by his comments and were not aware of any disruption caused. ECF No. 50 at 22–23; *see also, e.g.*, ECF No. 50-7 at 15 (interview with Officer Lozano). Similarly, when Deputy Chief Neville was asked at his deposition whether he could "identify any actual disruptions to the department's operations as a result of [Moser's] social media post," he answered "No." ECF No. 47 at 6 (citing ECF No. 38-5 at 15).

disruptions, "offensive speech on social media" could "seriously undermine [Metro's] mission . . . ."[153]  It therefore appears that the plaintiffs are primarily arguing (1) that preventing or mitigating harm to the community's trust in a public entity cannot, on its own, justify restricting an employee's speech and (2) that public entity must present some evidence demonstrating that its reputation was actually injured.  Both conclusions are unsound.

Although only briefly cited by Metro, the Ninth Circuit's decision in *Dible v. City of Chandler* is instructive.  There, the plaintiff was a police officer who ran a website for profit featuring pictures and videos of himself, his wife, and sometimes others engaging in sexually-explicit acts.[154]  The plaintiff attempted to keep his involvement with the site and his identity as an officer a secret, but his department and the media eventually discovered his side hustle.[155]  As a result of this revelation, several other officers were "questioned and ridiculed about the website" by the public while on duty, and the department was concerned that the scandal would "negatively impact" its efforts to recruit female officers.[156]  The police department found that the plaintiff "had violated the department's regulation prohibiting its officers from bringing discredit to the city service," and he was eventually fired.[157]

Balancing the parties' interests,[158] the Ninth Circuit first found that the plaintiff's conduct implicated limited free-speech interests because "public indecent activity" sits at the periphery of

_____

[153] ECF No. 50 at 22; *see also* ECF No. 47 at 4.

[154] *Dible*, 515 F.3d at 922.

[155] *Id*. at 923, 925.

[156] *Id*. at 924.

[157] *Id*. at 923.

[158] The Ninth Circuit held that, at step one of the *Pickering* framework, the plaintiff's activities "did not contribute speech on a matter of public concern." *Id*. at 927.  Normally, that conclusion would end the inquiry, but because it is unclear whether speech *unrelated* to the speaker's public

the First Amendment, and the plaintiff admitted that he ran the site "solely for profit."[159]  The

court ultimately held in favor of the city, reasoning that its

> interest . . . in maintaining the effective and efficient operation of
> the police department is particularly strong.  It would not seem to
> require an astute moral philosopher or a brilliant social scientist to
> discern the fact that [the plaintiff's] activities, when known to the
> public, would be "detrimental to the mission and functions of the
> employer."  [*City of San Diego v. Roe*, 543 U.S. 77, 84 (2004)].
> And although the government's justification cannot be mere
> speculation, it is entitled to rely on "reasonable predictions of
> disruption."  *Waters v. Churchill*, 511 U.S. 661, 673, 114 S.Ct.
> 1878, 1887, 128 L.Ed.2d 686 (1994) (plurality opinion).

> Police departments, and those who work for them, are engaged in a
> dangerous calling and have significant powers.  The public expects
> officers to behave with a high level of propriety, and,
> unsurprisingly, is outraged when they do not do so.  The law and
> their own safety demands that they be given a degree of respect,
> and the sleazy activities of [the plaintiff and his wife] could not
> help but undermine that respect.  Nor is this mere speculation.[160]

The Ninth Circuit further supported its conclusion by quoting from *Lucurto v. Guiliani*, the same

Second Circuit decision that the *Grutzmacher* court drew from, stating that "police officers 'are

quintessentially public servants' and 'part of their job is to safeguard the public's opinion of

them.'"[161]  The court thus rejected the plaintiff's argument that, because the police department

terminated him due to concerns about the public's potential reaction to news of his website, he

---

employment must address a matter of public concern to be afforded First Amendment protection,
*see supra* p. 24, the court proceeded to balance the parties' interests.  *Dible*, 515 F.3d at 927.

[159] *Id*. at 927–28.

[160] *Id*. at 928 (emphasis added).

[161] *Id*. at 929 (quoting *Locurto*, 447 F.3d at 178–79); *see also Locurto*, 447 F.3d at 178 ("Where
we part ways with the district court is in our recognition that the Government may, in some
circumstances, legitimately regard as 'disruptive' expressive activities that instantiate or
perpetuate a widespread public perception of police officers and firefighters as racist.").

was "being subjected to some kind of heckler's veto."[162]  The plaintiff's termination, the court

concluded, was "an example of the government's accounting for the public's perception of the

officers' actions when it considered the potential for disruption of the department's functions."

*Dible* thus demonstrates that, although the erosion of working relationships in a place of

public employment is a factor common to First Amendment retaliation claims, it is not (as the

plaintiffs here suggest) a precondition to finding that the government's interests outweigh the

employee's speech.  Rather, the government's interest in safeguarding the community's trust in

its public institutions can, on its own, justify curtailing an employee's speech in certain

circumstances.  And although the police department in *Dible* began experiencing the effects of

the disrepute caused by the plaintiff's pornographic website—such as the public ridicule some

officers encountered—the Ninth Circuit's decision makes clear that the likelihood of harm to a

public employer's reputation and the community's trust can be self-evident.  Indeed, it is well

established that a public employer does not need to "allow events to unfold to the extent" that the

harm caused by its employee's speech "is manifest before taking action."[163]  With this guidance,

I turn to weighing the plaintiffs' speech against Metro's interests.

*b.*    Pickering *balance - Sabatini*

Looking first at Sabatini's side of the scale, a couple factors weigh in favor of his free-

speech interests.  Most importantly, the Facebook posts related to his work that also touched on

matters of public concern—such as the NHL player being granted bail so quickly or the mass

release of inmates—express criticisms of a portion of the criminal-justice system that Sabatini

---

[162] *Id*. at 928–29.

[163] *Connick*, 461 U.S. at 152; *see also Tindle*, 56 F.3d at 972 ("A showing of actual disruption is not always required in the balancing process under *Pickering*.").

33

directly worked in as a corrections officer.[164]  And Sabatini made these posts on a personal

Facebook profile that had no privacy restrictions, meaning that his speech was targeted at a fairly

public audience.[165]  Conversely, the fact that many of Sabatini's posts, including some related to

his work as a corrections officer, did *not* raise matters of public concern, detracts from his

interest in his speech.  Indeed, the reasons that Metro gave in deciding to fire Sabatini—

including his exhibited disdain for inmates and prejudice against African Americans—stem from

both his protected and unprotected speech.[166]  Although this does not mean that Sabatini's

speech, taken as a whole, sits at the periphery of the First Amendment, his speech is also not

entitled to its core protections.

       On the other side of the scale, Metro has a strong interest in prohibiting the type of

Facebook posts that Sabatini made.  It reasonably concluded that his posts related to his work—

such as the many posts referring to inmates as "worthless," "dirtbags," and "turds" and CCDC as

"the cesspool"—demonstrated disdain for the very people under his care as a corrections officer.

And by sharing cartoons such as "Suicide Watch," which made light of inmate suicide, Sabatini

demonstrated, at best, an utter lack of judgment and, at worst, a complete disregard for the lives

of the suicidal inmates he was entrusted to safeguard in module 2C.  Similarly, Sabatini's non-

work-related posts—including sharing an image of President Obama hanging from a noose, an

---

[164] *See Grutzmacher*, 851 F.3d at 347–48 (comparing types of speech).

[165] *Liverman*, 844 F.3d at 407.

[166] Although Metro has argued that none (or little) of Sabatini's speech touched on a matter of public concern, it has not argued in the alternative that any speech that could be deemed protected was not the but-for cause of his termination under the final *Pickering* step.  *See Robinson*, 566 F.3d at 825 ("Defendants may avoid liability by showing that Robinson's protected speech was not a but-for cause of the adverse employment action.").

article on "Why Blacks are Ghetto Dwellers," and a post on how the "modern black [woman] has literally become a clown"—unquestionably exhibited racial animus.

Although it is undisputed that Sabatini's posts did not cause disruptions to CCDC's daily operations,[167] it does not "require an astute moral philosopher or a brilliant social scientist to discern the fact that" his posts, if discovered by the public, would harm the community's trust in its police department.[168] Our society entrusts its police "with significant powers,"[169] including the ability to detain fellow citizens while they await trial. And we expect and demand that the officers tasked with that role, like all members of law enforcement, perform their duties without prejudice towards persons accused of a crime or of any particular race.[170] As the Second Circuit explained in *Lucurto*, "[i]f the police department treats a segment of the population of any race, religion, gender, national origin, or sexual preference, etc., with contempt, so that the particular minority comes to regard the police as oppressor rather than protector, respect for law enforcement is eroded and the ability of the police to do its work in that community is impaired." And like the fire department in *Grutzmacher*, which "reasonably" found that the plaintiff's comments "supporting 'racism' or 'bias'" could "interfere with the public trust of [the plaintiff] being able to make fair decisions for everybody,"[171] Metro determined that Sabatini's "ability to

---

[167] Metro argues that, if the inmates learned of Sabatini's Facebook posts, his comments could have resulted in inmate unrest and therefore disrupted CCDC operations. ECF No. 41 at 35. But because Metro has provided no evidence showing it was likely that incarcerated individuals could discover Sabatini's posts, its argument is mere speculation and plays no role in my conclusion.

[168] *Dible*, 515 F.3d at 928.

[169] *Id.*

[170] *Locurto*, 447 F.3d at 178.

[171] *Grutzmacher*, 851 F.3d at 347; *see also Rankin*, 483 U.S. at 389 (highlighting the fact that the sheriff's office employee who stated that she hoped someone would try to shoot Reagan again made the statement to a coworker in private, so there wasn't "any danger that [she] had discredited the office"); *Dible*, 515 F.3d at 929 (briefly citing the private nature of the plaintiff's

effectively perform as a Corrections Officer, and provide services to inmates (particularly

minorities) who [he] clearly despise[s] [was] irreparably tarnished."[172]

There are also other factors that cut against Sabatini. For instance, Metro found that he

acted insubordinately by telling another corrections officer about the IAB investigation despite

being instructed not to discuss the matter and by continuing to post content with racial

undertones after the investigation began.[173] His comment about the NHL player also revealed

information he only learned about through his job. And although the fact that Sabatini's

Facebook posts were targeted at a fairly public audience weighs in favor of Sabatini's speech

interests, "[a] social media platform amplifies the distribution of the speaker's message," which

"increases the potential, in some cases exponentially, for departmental disruption . . . ."[174]

Indeed, Metro began investigating Sabatini after a member of the public saw his posts,

determined that he was a corrections officer, and was concerned enough to file a complaint.

When I weigh Metro's valid and significant concerns against Sabatini's moderate interest

in the Facebook posts he made, I find that the *Pickering* balance tilts strongly in Metro's favor.

Because Metro therefore did not violate Sabatini's First Amendment rights by disciplining him, I

grant it summary judgment on Sabatini's first retaliation claim.

---

speech in *Rankin* to underscore the potential for disruption by the plaintiff's public pornographic website).

[172] ECF No. 43-1 at 34–35. Sabatini argues that Metro's discipline was a viewpoint-based First Amendment infringement because it resulted from the department disagreeing with the beliefs his posts espoused. ECF No. 50 at 22. Although Sabatini argues that such a viewpoint-based restriction carries a stronger presumption of unconstitutionality, he cites no case law importing this facet of free-speech doctrine into the framework for a retaliation claim.

[173] *Grutzmacher*, 851 F.3d at 347 ("A public employee's interest in speaking on matters of public concern does not require that a public employer tolerate associated behavior that it reasonably believed was disruptive and insubordinate." (internal quotation marks, citation, and alterations omitted)).

[174] *Liverman*, 844 F.3d at 407.

c.      Pickering *balance – Moser*

Metro disciplined Moser over his single Facebook post, in which he commented that it was "a shame" the suspect in an officer-involved shooting "didn't have a few holes in him" once the police caught him. Metro does not challenge whether this statement touched on a matter of public concern, but at the *Pickering* balancing stage, I may nevertheless assess how close this comment comes to the core of the First Amendment's free-speech guarantee. Moser's comment is somewhat related to his work because it involved his colleagues catching a man suspected of shooting another officer. Nonetheless, the comment doesn't fit the normal public-concern mold because it conveys little that would help the public evaluate Metro's performance. Indeed, it is difficult to discern what message Moser was attempting to convey, especially given that he later stated that he posted the comment because he was simply upset at the moment due to how many officers had been killed in the line of duty the prior year.[175] So, although Metro has tacitly conceded that the comment touched on a matter of public concern, I find that it is not "of the same ilk" as the type of speech that normally outweighs a public employer's interests.[176] Conversely, the public nature of the comment, which was made in response to a post by a third-party about the suspect being apprehended, weighs in favor of Moser's free-speech interests. I ultimately find that Moser's speech, like Sabatini's posts, lies neither at the core nor the periphery of the First Amendment.

On the other side of the scale, Metro also has a strong interest in prohibiting its officers from making the type of statement Moser posted on Facebook. Another of the "significant powers" that our society bestows upon the police is the ability to use deadly force to defend

---

[175] ECF No. 43-5 at 25 (IAB interview with Moser).

[176] *See Grutzmacher*, 851 F.3d at 347–48 (comparing types of speech).

themselves and others.  The public therefore trusts that officers will rely on deadly force only when necessary, and this concern is heightened for officers whose roles more readily call upon them to draw their weapons.  This is certainly true of SWAT snipers, who, as Deputy Chief Neville explained, are the only officers in the department specifically "set up in a tactical situation and if necessary given a green light to kill someone."[177]  But Moser's post conveyed that he wanted his fellow officers to shoot (and possibly kill) the suspect, regardless of whether the use of deadly force (or any force) was necessary.  Even if Moser wasn't sincere, this cavalier and callous comment conveyed a lack of awareness for the degree for trust placed in SWAT officers.[178]

Moser primarily counters that Metro hasn't provided "any deposition testimony or affidavit testimony to demonstrate a reasonable prediction of real and not imagined disruption."[179]  But it bears repeating that it does not "require an astute moral philosopher or a brilliant social scientist to discern the fact that" Moser's posts, if discovered by the public, would harm the community's trust in its police department.[180]  As the Ninth Circuit recognized in *Dible*, "the public expects officers to behave with a high level of propriety, and, unsurprisingly,

---

[177] ECF No. 44-1 at 7 (Neville's deposition).  Moser counters "that even patrol officers (the position that [he] was transferred to) may have to use deadly force . . . ."  ECF No. 47 at 7.  Fair enough, but Neville's point is that, unlike other officers, SWAT snipers are specifically placed in a position to use deadly force.

[178] *See* ECF No. 44-1 at 25 (Labor Board decision) ("[T]he nature of the position in SWAT is that you are held to an incredibly high standard."); ECF No. 42-3 at 8 (deposition of Metro's Director of Labor Relations) ("[I]t appears from [Moser's] comment that he's become a little callus [sic] to killing someone.  And someone who's in SWAT who particularly has to shoot a lot, we want them taking that position very seriously and not taking it lightly.  And writing a comment like this shows that you might not take this as seriously anymore.").

[179] ECF No. 47 at 4 (emphasis omitted).

[180] *Dible*, 515 F.3d at 928.

is outraged when they do not do so."[181]  And Metro's interest in this case is greater than what

was at issue in *Dible*, where the plaintiff's website essentially constituted conduct unbecoming

an officer.  Here, Moser's comment led his superiors to question his judgment and therefore

fitness to serve as a SWAT sniper.[182]  And if more of the public had also read his post—

especially in conjunction with his profile picture of an angry-looking cartoon sniper—they too

would have likely questioned his fitness to serve in such a sensitive role.[183]

       Other factors also weigh against Moser.  Because he posted his comment in response to a

third-party's Facebook post, he did not speak in a private setting,[184] and the IAB investigator

determined that the content on his Facebook profile—which could be accessed by simply

clicking on his name above the post—would have allowed readers to discern that he was a Metro

officer.[185]  It is also undisputed that, near the time of his post, Moser had shot a suspect in his

---

[181] *Id.*

[182] *See* ECF No. 44-1 at 25; ECF No. 42-3 at 8.

[183] *See Grutzmacher*, 851 F.3d at 347 (finding that the plaintiff's post about killing "someone with a liberal" "advocated violence to certain classes of people and advocated using violence to effect a political agenda" and, along with his race-based statements, interfered with the public trust (quotation marks and brackets omitted)).

[184] Moser argues that his "case is indistinguishable from" the Reagan-related statement in *Rankin*.  ECF No. 38 at 6.  But as discussed above, that decision turned in part on the fact that the employee made the statement in private to a fellow employee.  *See supra* note 171.

[185] ECF 43-5 at 11.  Moser does not deny that there was content on his Facebook profile that would have allowed readers to discern that he was a Metro officer.  But he argues that IAB's conclusion on this issue, which is found in its report, is "unattributed hearsay" and that I therefore shouldn't consider it at summary judgment.  ECF No. 47 at 2.  But the statement was clearly being made by the IAB officer who investigated Moser and authored the report.  ECF No. 3-5 at 14 (listing the investigator as "Sgt. Z. Marsh"); ECF No. 43-5 at 19 (interview with Moser by the same sergeant).  And although the report itself is hearsay, the 2010 amendment to Federal Rule of Civil Procedure 56 "eliminate[d] the unequivocal requirement" that evidence must be admissible in its present *form* in order to be considered at summary judgment.  *Romero v. Nev. Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016).  Instead, the rule mandates that the *substance* of the proffered evidence be admissible at trial.  *Id.*; *see also* Fed. R. Civ. P. 56 advisory comm. note to 2010 amendment.  Accordingly, if this case had proceeded to trial, Metro could have simply called the IAB investigator to the stand to testify about the content of

role as a sniper, and as a result, he had been covered by the local news.[186]  This would have made

it even easier for anyone who came across the post to discover that Moser was a SWAT sniper.

Additionally, Deputy Chief Neville expressed concern that the post could expose Moser and

Metro to added scrutiny and legal liability if he was forced to shoot a suspect in a future

confrontation.[187]  Moser responds that an officer's use of force is evaluated under an objective-

reasonableness standard,[188] but this misses the point that any future use of deadly force by Moser

would have been more extensively scrutinized by the public and would more likely subject

Metro to suit.  Metro's prediction of likely future disruptions caused by Moser's continued

SWAT service is reasonable and therefore entitled to "substantial weight."[189]

On balance, I find that Metro's interest in transferring Moser out of SWAT outweighed

his moderate interest in the comment he posted on Facebook.  I therefore grant Metro and deny

Moser summary judgment on Moser's retaliation claim.

### B.  Because there is no evidence that Sabatini suffered an adverse employment action after he filed suit, his second retaliation claim fails.

Metro also moves for summary judgment on Sabatini's second retaliation claim, which is

premised on the allegation that his bureau commander planned to reassign him "due to

accusations of collusion with a coworker and this lawsuit."[190]  This claim suffers from several

---

Moser's Facebook profile.  And because Moser doesn't dispute the substance of the
investigator's conclusion regarding the profile, I may consider the statement at summary
judgment.

[186] ECF No. 43-5 at 11; ECF No. 44-1 at 7.

[187] ECF No. 44-1 at 7.

[188] ECF No. 47 at 7.

[189] *Tindle*, 56 F.3d at 972.

[190] ECF No. 7-1.

infirmities.  First, Sabatini's only evidence of the alleged contemplated transfer is a single vague sentence in his own declaration based on several layers of hearsay—i.e., what Sabatini avers his supervisor said he heard from the bureau commander.  And Sabatini has provided no additional evidence since his TRO motion was denied that Metro planned on reassigning him.  Conversely, Metro presents undisputed evidence that (1) it didn't transfer Sabatini after he filed suit against it[191] and (2) it routinely reassigns corrections officers to new posts in CCDC every three months, which does not affect their compensation, benefits, working hours, or days off.[192]

Sabatini also argues that, although Metro didn't end up reassigning him, the mere threat of reassignment constituted an adverse employment action.[193]  For an employment action by a public employer to implicate the First Amendment, the employee must show that the action was "reasonably likely to deter" him from engaging in protected speech.[194]  Although this is not a high threshold,[195] Sabatini has failed to show that the mere possibility of transferring to another unit with unchanged working conditions can constitute an adverse employment action.  He has not alleged—let alone provided evidence—that working in any other unit in CCDC is more arduous, more dangerous, or less prestigious.

---

[191] ECF No. 41 at 24 (citing ECF No. 43-5 at 2 (attendance records)).  The attendance records provided by Metro are not entirely clear.  Although Sabatini was assigned to module 2C when he filed suit, the records appear to show that he also worked in other units certain days of the month.  Nonetheless, Sabatini does not dispute that he was never transferred.

[192] ECF No. 10-39 (declaration of Deputy Chief Suey).

[193] ECF No. 50 at 26–27.

[194] *Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003).

[195] *Id*. at 975 ("To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind.").

Sabatini's brief citation to the Ninth Circuit's decision in *Antoine v. North Central Counties Consortium*[196] is unavailing. Although he asserts that an employer's verbal warning was sufficient in that case to constitute an adverse employment action, the employee there alleged that he suffered "a cascade" of retaliatory acts, including the warning, "an unsatisfactory evaluation," and his eventual termination.[197] Here, the mere possibility of a reassignment that would not have changed Sabatini's compensation or working conditions does not amount to an adverse employment action. I therefore grant Metro summary judgment on this claim.

* * *

In sum, I grant Metro summary judgment on both of Sabatini's First Amendment retaliation claims under counts one and three and Moser's sole retaliation claim under count one.

## II.   I also grant Metro summary judgment on the plaintiffs' facial challenges to its social-media policy.

Sabatini and Moser also bring two types of facial challenges to Metro's social-media policy. First, they contend that the policy is an overbroad prospective restriction on speech.[198] They then assert that the policy is impermissibly vague. I address each challenge in turn.[199]

---

[196] *Anthoine v. N. Cent. Ctys. Consortium*, 605 F.3d 740 (9th Cir. 2010).

[197] *Id*. at 748, 752.

[198] It is not clear from count one of Sabatini's complaint that he is challenging both his post-hoc discipline that resulted from violating the social-media policy and the policy itself as a prospective restriction on speech. *See supra* note 102. But because both he and Metro have construed count one as raising both a retaliation and a prospective-restriction challenge, and Moser has clearly raised a facial challenge, ECF No. 9 at 5, I address the prospective-restriction claims for both plaintiffs.

[199] Metro argues that Sabatini doesn't have standing to facially challenge its social-media policy because he retired and is therefore no longer constrained by the policy. ECF No. 49 at 4–5. But because Moser unquestionably has standing and I ultimately reject the facial challenge, I need not address Sabatini's standing.

**A.  Metro's interest in protecting the public trust outweighs the potential employee speech that the social-media policy proscribes.**

A facial challenge to a public-employer's policy that creates a prospective restriction on speech is similar to a retaliation claim, but it assesses the policy's impact on all prohibited employee speech rather than merely the plaintiff's interest in the specific speech that resulted in his discipline.[200]   Courts thus apply a modified version of the *Pickering* framework.[201]  First, courts assess the policy's breadth by examining its text to determine "whether the restriction reaches speech on a matter of public concern, and . . . whether [it] reaches speech only within the scope of a public employee's official duties."[202]  Courts then look to the public employer's justification for the policy, weighing "the impact of the ban as a whole—both on the employees whose speech may be curtailed and on the public interested in what they might say—against the

---

[200] *Moonin*, 868 F.3d at 861.  Sabatini argues that his challenge to the social-media policy is effectively a prior-restraint claim.  ECF No. 40 at 14.  But the Ninth Circuit has clarified that claims "concern[ing] a policy restricting employee speech" are "analytically distinct from claims involving archetypal prior restraints, like government licensing requirements affecting only citizen speech or judicial orders forbidding certain speech by private parties."  *Moonin*, 868 F.3d at 857 n.1.  The court also acknowledged, however, that it "sometimes use[s] the shorthand 'prior restraint'" to refer to such claims.  *Id.*; *see also Barone*, 902 F.3d at 1101 (referring to this type of facial challenge as a "prior restraint claim" without any caveat).

[201] *Moonin*, 868 F.3d at 861; *see also Liverman*, 844 F.3d at 407 ("In *United States v. Nat'l Treasury Employees Union* (*NTEU*), 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), the Supreme Court addressed how courts should apply *Pickering* when a generally applicable statute or regulation (as opposed to a post-hoc disciplinary action) operates as a prior restraint on speech.").

[202] *Barone*, 902 F.3d at 1102; *Moonin*, 868 F.3d at 861.  Although both sides agree that the *Pickering* framework is appropriate for this challenge, Sabatini also cites to case law regarding overbreadth challenges not tied to the public-employee paradigm.  *E.g.*, ECF No. 40 at 13 (citing *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202 (9th Cir. 2010) (addressing an overbreadth challenge to criminal child sexual abuse statutes).  But although the plaintiffs' prospective-restriction claims are not traditional overbreadth challenges, they are analytically similar in part.  *See, e.g.*, *Liverman*, 844 F.3d 400, 408 ("[W]e begin by noting the astonishing breadth of the social networking policy's language.").

43

restricted speech's 'necessary impact on the actual operation' of the Government."[203] "'Unlike an adverse action taken in response to actual speech,' a prospective restriction 'chills potential speech before it happens.' The government therefore must shoulder a heavier burden when it seeks to justify [a prospective] restriction as opposed to 'an isolated disciplinary action.'"[204] Additionally, there must be a "close and rational relationship between the policy and legitimate government interests."[205]

Looking first to the scope of Metro's social-media policy, because it regulates the employees' use of social media in their off hours, the policy undoubtedly reaches speech they make as private citizens. I must therefore assess whether and to what extent the types and topics of speech regulated by the policy would touch on matters of public concern. In other words, to what extent does the policy restrict speech protected under the First Amendment? Metro's policy is modeled after the *Pickering* framework, instructing employees that they "are free to express themselves as private citizens in matters of public concern" as long as their speech doesn't "[i]mpair working relationships," "[i]mpede the performance of duties," "[i]mpair discipline and harmony among coworkers," or "[n]egatively impact or tend to impact the department's ability to serve the public." Because the policy formulaically prohibits only the types of speech that would tilt the *Pickering* balance in Metro's favor, it is difficult to conclude that the policy as whole is overbroad.[206]

---

[203] *Moonin*, 868 F.3d at 861 (quoting *NTEU*, 513 U.S. at 468).

[204] *Id.* (internal citation and brackets omitted) (quoting *NTEU*, 513 U.S. at 468).

[205] *Barone*, 902 F.3d at 1104 (9th Cir. 2018) (quoting *Gibson v. Office of Atty. Gen*, 561 F.3d 920, 928 (9th Cir. 2009)).

[206] *See* Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 948 (3rd ed. 2006) (inverting the facts of *Board of Airport Commissioners v. Jews for Jesus, Inc*., 482 U.S. 569 (1987), and concluding that, if an ordinance was written to "prohibit all speech *not* protected by

Sabatini therefore addresses only one facet of the policy: its prohibition on "speech that ridicules, maligns, disparages, or otherwise promotes discrimination against race, ethnicity, religion, sex, national origin, sexual orientation, age, disability, political affiliation, gender identity and expression or other explicit class of individuals . . . ."[207] As seen above in the step-one analysis for Sabatini's retaliation claim, it is possible for comments like his post involving President Obama to both touch on matters of public concern and to promote racial discrimination. The two concepts are not mutually exclusive. I must therefore determine the degree of protected speech that the "promotes discrimination" provision reaches. Arguing that the policy extends to a "substantial amount of protected speech," Sabatini highlights several topics that he contends would subject an employee to discipline.[208] He opines, for instance, that "[e]xpressing disapproval of a Democratic or Republican politician" or criticizing David Duke, the Ku Klux Klan leader, would constitute "disparaging" or "maligning" a person for their "political affiliation" under the policy.[209] He also highlights "ridiculing" someone like Tom Cruise for his belief in Scientology or stating that "a Christian cake baker should not have to bake a wedding cake for a gay couple." And Sabatini further points to the fact that Metro's Director of Labor Relations could not define the phrase "explicit class of individuals" under the policy.[210]

---

the First Amendment, it would, by definition not by overbroad" but would be vague (emphasis added)). That is not to say that the policy here is vague—an issue I address *infra*.

[207] ECF No. 42-2 at 5; ECF No. 40 at 15 (Sabatini's motion for summary judgment).

[208] ECF No. 40 at 16, 19.

[209] *Id*. at 19.

[210] ECF No. 40-4 at 12.

Although it is possible for the promotes-discrimination provision on its own to reach the areas of speech illustrated by Sabatini's hypotheticals, I must construe the provision in the context of the broader social-media policy and "consider whether the [policy] is 'readily susceptible' to a limiting construction that would render it constitutional."[211]  Metro contends that the policy limits it own reach "to non-protected speech that improperly damages and impairs the reputation and efficiency of the Department."[212]  Indeed, the policy issues overarching guidance throughout, instructing employees that they must "avoid damaging the reputation and trust the department has with the community," not post content on social media that would "[n]egatively impact or tend to negatively impact the department's ability to serve the public," and not use social media in a way that would "bring the member or the department into discredit or would tend to bring the member or the department into discredit."[213]  And Line 29 of Metro's Disciplinary Decision Guide, which the department applied to Sabatini, punishes any "[a]ny act or omission of such an egregious nature that the employee is rendered ineffective in his position and/or the act or omission would tend to bring the Department into public discredit."[214]

Sabatini responds that the policy's additional language doesn't sufficiently limit its reach, relying primarily on the Fourth Circuit's decision in *Liverman v. City of Petersburg*.  There, a police department issued a social-media policy that proscribed "dissemination of any information 'that would tend to discredit or reflect unfavorably upon the Department or any other City . . .

---

[211] *Kroger*, 622 F.3d at 1208 (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988)); *see also, e.g.*, *Liverman*, 844 F.3d at 409 (addressing whether another provision in the social-media policy at issue could "narrow" the policy's reach).

[212] ECF No. 49 at 16.

[213] ECF No. 42-2 at 2, 3, 5.

[214] Although Sabatini doesn't address Line 29 in his summary-judgment motion, he alleges in his complaint that, along with the policy, it "impose[s] a significant burden on expressive activity." ECF No. 6 at 7.

Department or its employees," and prohibited officers from making "[n]egative comments on the internal operations" of the department.[215]  The policy also "strongly discourage[d] employees from posting information regarding off-duty activities" on social media.[216]  The plaintiffs, two veteran police officers, were disciplined for violating this policy based on a series of Facebook comments they exchanged, in which they criticized the department's trend of promoting less-experienced officers to instructor and supervisor positions.[217]  Addressing the plaintiffs' facial challenge to the social-media policy, the Fourth Circuit first noted the policy's "astonishing breadth," finding that the "Negative Comments Provision" could "reach just about anything . . . ."[218]  The court concluded that the policy stunted the ability of officers to publicly discuss and debate their department's policies—a topic that they, above many other citizens, were the most qualified to comment on.[219]  And in ultimately finding that the policy's burden on speech outweighed the government's interests, the court rejected the department's argument that the policy was "significantly narrow[ed]" by a provision within it that "permit[ted] comments on 'issues of general or public concern . . . so long as the comments d[id] not disrupt the workforce' . . . ."[220]  "The milder language in a single provision," the Fourth Circuit reasoned,

---

[215] *Liverman*, 844 F.3d at 404.

[216] *Id.*

[217] *Id.* at 405.

[218] *Id.* at 408.

[219] *Id.* ("The Department's law enforcement policies could well become a matter of constructive public debate and dialogue between law enforcement officers and those whose safety they are sworn to protect.  After all, '[g]overnment employees are often in the best position to know what ails the agencies for which they work.'").

[220] *Id.* at 409.

did "not salvage the unacceptable overbreadth of the social networking policy taken as a whole."[221]

But Metro's social-media policy has a far narrower scope than the policy in *Liverman*, which effectively prohibited any public criticism of the department. That policy thus encroached deeply into the areas of public-employee speech that *Pickering* and its progeny protect. And because the limiting language in *Liverman* was clearly at odds with the remainder of the policy, the language unsurprisingly failed to redeem it. Metro's policy, by contrast, does not prohibit its employees from speaking on matters of department policy or actions and from thus bringing to light what "ails" the community's police force.[222] Nor does the policy prohibit employees from commenting on any particular topic, related or unrelated to the employee's work.[223] Rather, the policy's objective—repeated throughout its text—is to prevent its employees from posting content online that would impair its ability to function by, among other things, eroding the public's trust in the department. To this end, the policy specifically seeks to prevent its employees from promoting discrimination against others. Although that proscription may overlap to some degree with topics of public concern that an officer may wish to discuss online, Metro's policy does not intrude nearly as far into the realm of protected speech as the policy in *Liverman* or as far as Sabatini suggests. Indeed, the policy does not prevent an officer from commenting on politics, religion, or current events, but only from doing so in a manner that would discredit the officer and the department.

---

[221] *Id.*

[222] *Moonin*, 868 F.3d at 860.

[223] *See, e.g.*, *id*. at 589 (finding unconstitutional a highway-patrol department policy that prohibited officers from commenting publicly about the department's K9 program).

This brings me to Metro's justification for the policy, which I must weigh against the impact on employee speech as a whole.  As discussed extensively above, Metro has a strong interest in maintaining public trust by prohibiting speech that would cause the public to question its ability to "enforce[] the law fairly, even-handedly, and without bias."[224]  And although a prospective restriction on speech requires a greater showing than post-hoc discipline, I find that Metro's interest still satisfies this higher burden because public faith in the fair, unbiased administration of public institutions—especially the criminal-justice system—is fundamental to our democratic society.  That trust is eroded by police-officer speech that "ridicules, maligns, disparages, or otherwise promotes discrimination against race, ethnicity, religion, sex," etc.  Accordingly, there is a "close and rational relationship" between Metro's interest in preserving the public's trust and its social-media policy, which is tailored to prohibit speech that Metro has a legitimate and overriding interest in prohibiting under the *Pickering* framework.  The plaintiffs' overbreadth prospective-restriction claims therefore fail.

> **B.**     **Because the plaintiffs' Facebook posts clearly violated the social-media policy, they cannot successfully argue that it is vague.**

"The void for vagueness doctrine arose as an aspect of Fourteenth Amendment due process in the context of criminal statutes because it was thought unfair to punish persons for conduct which they had no notice could subject them to criminal punishment."[225]  Over time, the doctrine expanded to civil repercussions, including "the discharge of public employees."[226]  In "that context, the Supreme Court has reiterated that the vagueness doctrine is based on fair notice

---

[224] *Locurto*, 447 F.3d at 178.

[225] *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1135 (3d Cir. 1992).

[226] *Id.*

that certain conduct puts persons at risk of discharge.  Such standards are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge."[227]  And although not addressed by either plaintiff, the test for vagueness is "more relaxed" where the statute or policy at issue "clearly implicates free speech rights . . . ."[228]  But I need not delve into this distinction because "a plaintiff who engages in some conduct that is clearly proscribed" by the policy at issue cannot challenge it as vague.[229] And the Supreme Court has "clarified that th[is] rule makes no exception for vagueness challenges that implicate the First Amendment."[230]

Because Sabatini and Moser's speech clearly violated Metro's social-media policy, their vagueness claims fail.  There can be little doubt that Sabatini's posts unrelated to his work violated the social-media policy by promoting discrimination against African Americans.  He nonetheless attempts to recast and sanitize his Facebook posts, arguing for instance that his comments about Black Lives Matter merely criticized a political movement and that he never explicitly called for President Obama to be lynched.[231]  But what is clear from every layer of process that Sabatini received within Metro is that the department was not concerned with what topics he commented on or what viewpoints he took, but rather the denigrating, racially insensitive manner in which he addressed those topics.  A public servant can espouse the

---

[227] *Id*. at 1136 (quoting *Arnett v. Kennedy*, 416 U.S. 134, 159 (1974) (plurality opinion)).

[228] *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1146 (9th Cir. 2009) (citation omitted).

[229] *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 495 (1982).

[230] *United States v. Di Pietro*, 615 F.3d 1369, 1372 (11th Cir. 2010) (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010)); *see also Doe v. Valencia Coll*., 903 F.3d 1220, 1233 (11th Cir. 2018).

[231] ECF No. 55 at 21.

viewpoint, for instance, that President Obama was an ineffective leader or that Michael Brown is

unworthy of praise, but by steeping his comments in imagery and stereotypes evoking powerful

racial bias and animus, Sabatini clearly violated Metro's social-media policy.[232]  Indeed, he

acknowledged to IAB that several of his posts could be interpreted as promoting bias, and he

admitted that Facebook had suspended his account on several occasions due to the content he

posted.  Because Sabatini therefore had more than adequate notice that his posts violated the

social-media policy and endangered his public employment, his vagueness challenge fails.

Similarly, Moser's single post about a suspect not having "a few holes in him" clearly

violated the policy's proscription on posting material that would discredit the officer or the

department.  Although that prohibition is slightly more open-ended than the promotes-

discrimination provision, a person of "ordinary common sense" would know that a comment by

a SWAT sniper that is so callous and cavalier about the use of deadly force would violate the

social-media policy.  And Moser acknowledged after the fact that his comment was "completely

inappropriate."  His vagueness challenge therefore also fails.

* * *

In sum, I deny Sabatini summary judgment on his first and fifth claims for his facial

challenges under the U.S. Constitution.[233]  I also grant Metro summary judgment on these same

claims for Sabatini, and on Moser's facial challenge under count two of his complaint.  Because I

have granted Metro summary judgment on all of Moser's claims and only he sued individual

---

[232] Sabatini also points to the fact that Metro personnel could not define the phrase "explicit class of individuals" under the promotes-discrimination provision, arguing that the department could interpret the phrase to prohibit criticism of its leadership.  ECF No. 40 at 29–30.  But this is mere speculation, and the fact that Sabatini clearly violated this provision by promoting racial discrimination prevents him from challenging the remainder of the policy as vague.

[233] Sabatini mistakenly labels his fifth and sixth claims as "third" and "fourth" claim for relief.

defendants Devin Ballard and Patrick Neville, all claims against these defendants are dismissed from this case.

**III.    I grant Metro leave to file a motion addressing Sabatini's claims under the Nevada Constitution.**

Sabatini has alleged two retaliation claims and a facial challenge under the Nevada Constitution under the same basis as his federal claims.  Although Metro did not title its motion as one for *partial* summary judgment, it has addressed only Sabatini's federal claims.  Because Nevada's constitutional guarantees largely overlap with the U.S. Constitution,[234] Metro may have intended for its arguments to extend to Sabatini's state-law claims.  But because neither Metro nor Sabatini has addressed this issue, I grant Metro leave to file a limited summary-judgment motion on these state-law claims within 20 days.  Sabatini may file a response and Metro may reply within the standard summary-judgment briefing schedule.

<b>Conclusion</b>

Accordingly, IT IS HEREBY ORDERED that:

- Charles Moser and John Sabatini's **motions for partial summary judgment [ECF Nos. 38, 40] are DENIED;**

- Defendants' **partial motion for summary judgment [ECF No. 41] is GRANTED** on all of Moser's claims and all of Sabatini's federal claims under counts one, three, and five

---

[234] *See Univ. & Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't*, 100 P.3d 179, 187 (Nev. 2004) ("Article 1, Section 9 of the Nevada Constitution protects the general right of the people to engage in expressive activities in this state.  We have held that Article 1, Section 9 affords no greater protection to speech activity than does the First Amendment to the United States Constitution.").

(mislabeled as "third claim for relief").  All claims against individual defendants **Devin Ballard and Patrick Neville are DISMISSED from this case;**

- Metro is granted leave to file a **limited summary-judgment motion** on Sabatini's remaining claims under the Nevada Constitution **by April 8, 2019**.  Sabatini may file a response and Metro may reply within the standard summary-judgment briefing schedule;

- Good cause appearing, Metro's motion for leave to file excess pages **[ECF No. 39] is GRANTED nunc pro tunc.**

Dated: March 19, 2019

_____
U.S. District Judge Jennifer A. Dorsey